**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

CHRISTINE TIANO,

                  Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

                  Defendant.

Civ. Action No. 18-14620 (FLW)

**OPINION**

**WOLFSON, Chief Judge:**

      Plaintiff Christine Tiano ("Plaintiff") seeks review of a final decision of the Commissioner of Social Security ("Commissioner"), which denied Plaintiff's application for disability insurance benefits under Title II of the Social Security Act (the "Act"), for the period from May 22, 2013 through August 1, 2017. This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 405(g). Plaintiff was 46 years old on her alleged disability onset date, has a high school education, and has past relevant work experience as a receptionist. She filed for disability insurance benefits on September 7, 2014. In this appeal, Plaintiff contends that the Commissioner's determination—which found that Plaintiff was not under a disability—is based on an incorrect application of the law and is not supported by substantial evidence. After reviewing the administrative record, the Court finds that the Commissioner, acting through an Administrative Law Judge ("ALJ"), pursuant to 20 C.F.R. § 404.929 *et seq.*, correctly applied the law and based his decision on substantial evidence. Accordingly, for the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

**I.      BACKGROUND**

    A.     Procedural History

On September 7, 2014, Plaintiff applied for disability insurance benefits, alleging a period of disability beginning on May 22, 2013.  (Tr. 83)[1]  Plaintiff based her disability on the following medical conditions: Sjogren's syndrome, myositis, small fiber neuropathy, hypothyroid issues, hypertension, an overactive bladder, migraine headaches, obesity, and anxiety.  (Tr. 83.)  The state agency denied her claims initially, and on reconsideration.  (Tr. 113-17, 119-21.)

On April 17, 2017, at Plaintiff's request, a hearing was held before an ALJ, at which Plaintiff, who was represented by counsel, and an impartial vocational expert both testified. (Tr. 48-82.)  Following the hearing, on August 1, 2017, the ALJ issued a 30-page decision finding that Plaintiff could perform a limited range of light, unskilled work, and, therefore, was not disabled within the meaning of the Act.  (Tr. 10-42.)  Thereafter, Plaintiff sought review by the Appeals Council, which found no basis on which to alter the ALJ's decision and denied Plaintiff's request for review.  (Tr. 1-6.)  This appeal followed.

    B.     The Administrative Record

          1)     Medical Evidence

              a)     Objective Evidence

During the period of alleged disability, Plaintiff received treatment for her impairments, which included Sjogren's syndrome, hypothyroidism, myositis, and small fiber neuropathy.  In May 2013, Plaintiff reported to her physician that she was "not doing well."  (Tr. 378.)  She noted

---

[1] References to "Tr." are to the administrative record, which was electronically filed by the Government, pursuant to L. Civ. R. 9.1(c)(1).  (See ECF No. 7.)  The Court notes that portions of the administrative record, as well as portions of the brief filed by Plaintiff (*see* ECF No. 15), are not text searchable.  To assist the Court in its review in subsequent cases, the Court requests that the parties ensure that all PDFs are text searchable before filing such documents.  *See* L. Civ. R. 1(h) (stating that "PDF documents should be text searchable").

that her symptoms had resolved with Prednisone 40 mg but had returned when her physician lowered the medication dose to 20 mg. (Tr. 378.) Plaintiff reported generalized fatigue, muscle aches in the upper and lower extremities, and joint pain involving the hands, knees, feet, and neck. (Tr. 378.) She denied joint swelling and reported morning stiffness for an hour or so. (Tr. 378.) On examination, Plaintiff had full range of motion in the shoulders, elbows, wrists, and hips. (Tr. 378.) She had osteoarthritic changes in both hands with decreased grip strength and crepitus in her knees, but no active synovitis. (Tr. 379.) An EMG of the upper and lower extremities was normal and did not show neuropathic or myopathic disease. (Tr. 386, 538.) Plaintiff's medication was adjusted, and she was advised to get a second opinion with another rheumatologist. (Tr. 379.)

In July 2013, Plaintiff had a rheumatology consultation with Suleman Bhana, M.D., and reported fatigue, generalized weakness, weight gain, night sweats, dry eyes and mouth, shortness of breath, and numbness and tingling in her bilateral fingertips and toes. (Tr. 385.) On examination, Plaintiff had tenderness in her fingers and hips but no synovitis. (Tr. 386.) She had full (5/5) strength in the upper and lower extremities and normal grip strength. (Tr. 386.) Dr. Bhana assessed Sjogren's syndrome with a variety of systemic manifestations. (Tr. 387.)

In August 2013, Plaintiff reported intermittent right arm and hand numbness, but an examination with a neurologist, Raji P. Grewal, M.D., was normal, with intact fine motor skills, strength, balance, coordination, and gait, negative Brudzinski's, Babinski's, and Kernig's signs, and no focal weakness. (Tr. 440-41.) Plaintiff was diagnosed with mixed connective tissue disease; inflammatory and immune myopathies; and small fiber neuropathy. (Tr. 441.)

In October 2013, Plaintiff reported to a neurosurgeon, Gregory Przybylski, M.D., that she was not taking her medication in anticipation of an upcoming muscle biopsy; she noted that most of her symptoms were in her neck, shoulders, and arms, although she occasionally got hip and

3

thigh pain.  (Tr. 409, 412, 530.)  Plaintiff was able to do activities of daily living and took Advil for pain, which provided relief.  (Tr. 409.)  On examination, she had normal (5/5) upper and lower limb strength, sensation, and reflexes.  (Tr. 408.)  She had a normal casual and tandem gait with intact heel and toe walking.  (Tr. 408)  Dr. Przybylski noted that Plaintiff had a normal EMG, which was not consistent with myositis.  (Tr. 408, 412, 531.)

In November 2013, a muscle biopsy was suggestive of "very mild" neurogenic atrophy with no evidence of myositis or myopathy.  (Tr. 410.)  Plaintiff had 5/5 muscle strength although she used her arms as well as her legs to rise from a seated position.  (Tr. 412, 433.)  She had a normal gait with intact balance and fine motor skills.  (Tr. 433.)

In February 2014, Plaintiff started receiving IV immunoglobulins weekly.  (Tr. 428.)  Thereafter, she reported improvements, including improvements in her symptoms of weakness or neuropathy.  (Tr. 428, 508, 630.)  By April 2014, Plaintiff was "feel[ing] the best that she ha[d] felt in a long time," and she denied stiffness or aches and was "relatively pain-free" with 5/5 muscle strength in all extremities.  (Tr. 446, 617.)

Progress notes from Dr. Bhana in June 2014 show that Plaintiff was still feeling better, with improved muscle weakness and minimal morning stiffness.  (Tr. 521.)  She reported tenderness in her fingers in September 2014, and fatigue and headaches in October 2014, but joint examinations were otherwise normal with no swelling or pain in her hips, knees, ankles, wrists, elbows, or shoulders.  (Tr. 507, 559.)

In November 2014, during a consultative examination with Annamarie Resnikoff, Ph.D., Plaintiff reported that she cared for herself independently and ran errands such as going to the food store or the bank.  (Tr. 488-89.)  She watched television, read, used her iPad, and cooked with help from her husband and daughters.  (Tr. 488-89.)

In January 2015, Plaintiff had a normal examination of all joints in the upper and lower extremities with no pain, swelling, or loss of motion. (Tr. 506). She had full 5/5 strength in the upper extremities and only slightly reduced (4/5) strength in the lower extremities. (Tr. 506.) In April 2015, she stated that she had "improved" and had "no active problems" although she still had some exercise intolerance. (Tr. 608, 616.)

In June 2015, an EMG showed noninflammatory "mild" myopathy with improvement when compared with Plaintiff's previous EMG. (Tr. 612, 618.) On examination, Dr. Grewal noted good sensation, normoactive reflexes, nearly-full 5-/5 strength in the deltoid, triceps, biceps, and hips, and intact strength in her remaining distal muscles. (Tr. 614). Plaintiff's inflammatory symptoms were responsive to IV therapy, and Dr. Grewal recommended continued treatment. (Tr. 614.)

In October 2015, Plaintiff reported an episode of increased fatigue after a viral cold but, on examination, she had 5/5 strength, full, non-tender range of motion in the hands, wrists, elbows, shoulders, hips, knees, ankles, and feet with no synovitis, tenderness, or diffuse tender points. (Tr. 713-15.) By December 2015, Plaintiff reported that her "fatigue and joint pain [were] better." (Tr. 717.) She showed no evidence of an autoimmune disease, and she continued to have 5/5 strength and full range of motion in the upper and lower extremities, with no synovitis, tenderness, or diffuse tender points. (Tr. 717-19.)

Plaintiff showed no active synovitis or evidence of inflammatory disease in March and April 2016. (Tr. 857, 873, 879.) She noted in June 2016 that her pain was better and she was not having morning stiffness. (Tr. 869.) She reported dry eyes, mouth, and nose, but, on examination, she had 4+/5 strength in the proximal thighs, 5/5 strength in the distal lower extremities, and a normal neurologic exam. (Tr. 612, 614, 616, 869-71.) A few fibromyalgia tender points were

noted, but Plaintiff had no synovitis. (Tr. 872.) Plaintiff's physician, Amanda Ahmed Borham, M.D., noted that her Sjogren's syndrome and myositis had "improved." (Tr. 873.) In July and August 2016, Dr. Grewal agreed, noting that Plaintiff's inflammatory myopathy was "responsive to therapy." (Tr. 612, 614.)

Thereafter, Plaintiff reported intermittent complaints of joint pain or tenderness, but she continued to have generally normal physical examinations with unchanged myositis and Sjogren's syndrome. (Tr. 582-84, 849, 857-58, 863, 869, 871.) Plaintiff was "feeling quite healthy" and reported that her rheumatologist stated "everything was fine." (Tr. 582-84.) Her Sjogren's syndrome was generally "stable" with proper treatment without acute symptoms. (Tr. 582-584.)

      b)    <u>Opinion Evidence</u>

On May 19, 2014, Plaintiff's rheumatologist, Dr. Bhana, wrote a letter stating that a prior FMLA form erroneously said that Plaintiff could work a full eight-hour day, seven days a week, but Plaintiff was not actually able to work those hours. (Tr. 632). Dr. Bhana stated that, due to her autoimmune disease, Plaintiff was not able to work those hours for more than a year and that she would not be able to work full-time for at least another six months until her condition responded better to treatment. (Tr. 632.)

On October 20, 2014, Jerry Cabas-Vargas, M.D., stated that Plaintiff could lift and carry five pounds occasionally; stand/walk less than two hours in an eight-hour day; and sit less than six hours in an eight-hour day. (Tr. 483.) Dr. Cabas-Vargas stated that Plaintiff was limited with regard to pushing and/or pulling heavy objects, which he defined as one weighing over five pounds. (Tr. 483.) Dr. Cabas-Vargas also stated that Plaintiff had limited fine motor skills (Tr. 483.)

On December 18, 2014, a state agency physician, Nawal Abdelmessieh, M.D., reviewed the evidence of record and opined that Plaintiff was not disabled. (Tr. 92-95.) Dr. Abdelmessieh stated that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; she could stand and walk three hours in an eight-hour day; she could sit for six hours in an eight-hour day; and she had unlimited ability to push and pull. (Tr. 92-93.) Dr. Abdelmessieh opined that Plaintiff has occasional postural limitations and that she was limited to occasional right and left overhead reaching, but that she had no limitations handling, fingering, or feeling. (Tr. 93-94.) On April 21, 2015, a second physician, Arthur Pirone, M.D., reviewed the evidence of record and affirmed the findings of Dr. Abdelmessieh. (Tr. 105, 108-09.)

On May 12, 2015, Tanisha Mathur, M.D., noted that Plaintiff sought treatment at her rheumatology center and that she continued to be "very symptomatic." (Tr. 622.) Dr. Mathur did not assess any specific functional limitations.

In a May 13, 2015 letter, Plaintiff's nurse, Eileen Speranza, R.N., stated that Plaintiff was unable to work due to her Sjogren's syndrome and other impairments. (Tr. 624.) Ms. Speranza noted that she gave IV infusions to Plaintiff at Plaintiff's home and spent over 200 hours with Plaintiff. (Tr. 624.) Ms. Speranza did not assess any specific functional limitations.

In a May 15, 2015 letter, Plaintiff's primary care physician, Erica Erb, M.D., stated that many of the medications that Plaintiff took caused significant side effects that made it difficult for her to perform her usual functions. (Tr. 588.) Dr. Erb did not assess any specific functional limitations.

In a June 2015 letter, Plaintiff's neurologist, Dr. Grewal, submitted a letter stating that Plaintiff's inflammatory myositis and small fiber neuropathy would "impact" her work and make working an eight-hour day difficult to endure. (Tr. 625.) Dr. Grewal noted that Plaintiff's

symptoms had "improved," but that she still had some muscle weakness and exercise intolerance. (Tr. 625.) Dr. Grewal did not assess any specific functional limitations.

        2)        Testimonial Evidence

            a)        Plaintiff's Testimony

At the April 17, 2017 hearing before the ALJ, Plaintiff testified that she worked about 12 hours each week with gross monthly earnings of $750.00. (Tr. 53.) She testified that she was a high school graduate with past work experience as a full-time medical receptionist. (Tr. 53-54.) She testified that she stopped working when she became ill. (Tr. 53.)

Plaintiff testified that she was diagnosed in 2011 with Sjogren's syndrome, which causes her to have severe fatigue, malaise, shortness of breath, dryness, coughs, trouble concentrating and a lot of chronic pain. (Tr. 55.) She testified that she was later diagnosed with myositis, inflammatory muscle disease, small fiber neuropathy, thyroid disease, migraine headaches, anxiety and hypertension. (Tr. 55-56.) Plaintiff testified that all of the conditions were related to her Sjogren's syndrome except her anxiety and hypertension. (Tr. 56.)

Plaintiff testified that she stopped working because she was in a lot of pain and had high muscle and liver enzymes. (Tr. 56.) She testified that she started treating her conditions by taking Prednisone and that she stopped working on the advice of her doctors. (Tr. 56.) Plaintiff testified that she also stopped working because she was having trouble at work with pain and fatigue. (Tr. 56.) She testified that was having trouble staying awake and had dry eyes, dry mouth. (Tr. 56.) Plaintiff testified that it was hard for her to speak and her blurry and dry eyes and headaches made it difficult to work. (Tr. 57.)

Plaintiff testified that her fatigue and malaise was like having the flu, with some days worse than others. (Tr. 57.). She testified that most of her days are spent sitting or lying down and that she must sleep every day as a matter of necessity. (Tr. 57-58.) Plaintiff testified that she worked

8

part-time three days each week from 8:30 am to 12:15 pm. (Tr. 58.) She testified that she would not be able to work more without being a detriment to her health. (Tr. 58.)

Plaintiff testified that she developed shortness of breath around 2012 and experienced difficulties walking and using stairs. (Tr. 59.) She testified that she would become short of breath after walking three to four blocks and would need to rest after walking such distance. (Tr. 60.) Plaintiff testified that she had an inhaler for her breathing difficulties, which she used maybe once per day but that she might use it more if she went out. (Tr. 60.) She testified that she could stand for only one hour before she developed pain in her hips and her legs would become heavy and tired. (Tr. 60.) Plaintiff testified that she cannot sit for too long with getting pain in her hips and neck. (Tr. 61.)

Plaintiff testified that she had headaches, neck pain, joint pain in the hands, fingers, elbows, knees, and hips. (Tr. 61.) She testified that she had muscle weakness but under goes infusions to help with the muscle weakness. (Tr. 61.) Plaintiff testified that IVIG infusions were part of her treatment plan to help with her immune system and muscle weakness. (Tr. 42.) She testified that, at the time of her hearing, she was receiving infusions at home every three weeks and a different infusion at the hospital every six months. (Tr. 62.) The home infusions last for about five hours and are administered by a nurse. (Tr. 61-62.) After each infusion, Plaintiff stated that she will usually get a severe headache through the night and that she would be tired and nauseous with more of a mild headache the next day. (Tr. 62.) Plaintiff testified that she will usually stay home after an infusion. (Tr. 62.)

Plaintiff further testified that she had headaches every single day with an average severity level of 6 on a scale from 1 to 10. (Tr. 63.) She testified that she usually needed to sleep when

9

having headaches, and that she had been taking ibuprofen for headaches but developed an ulcer. (Tr. 63.) She testified that she presently used extra strength Tylenol. (Tr. 64.)

Plaintiff testified that Sjogren's syndrome causes dry mouth which makes it difficult for her to talk of long periods of time and that she used eye drops five to six time each day due to her dry eyes. (Tr. 64.) She explained that she has a pretty bad dry cough along with diarrhea and constipation, depending on the day and the medications. (Tr. 64.) Plaintiff claimed that she had a lot of short term memory loss and trouble concentrating and focusing. (Tr. 65.) She testified that her hands were mostly numb and tingling. (Tr. 66.) According to Plaintiff, her weakness improved with the infusions, but she had difficulty raising her hand over her head and could not hold her hands over her head for more than a few seconds due to pain. (Tr. 66-67.)

Plaintiff testified that, in addition to infusions, she was taking Methotrexate to treat the Sjogen's syndrome, and that the side effects from the Methotrexate included nausea, diarrhea, sun sensitivity, low energy, decreased while blood cells, hair loss and itching. (Tr. 68.) Plaintiff testified that she was also taking Plaquenil, an anti-rheumatic medication, used to treat Sjogen's syndrome, but she experienced side effects from the Plaquenil included damage to the retina, fatigue, weakness, diarrhea, headache and skin rash. (Tr. 68.) She testified that she was also taking blood pressure medication, a drug for hair loss, a drug for saliva production and eye drops. (Tr. 68.) Plaintiff stated that she was taking Albuterol for breathing and Fluoxetine for anxiety. (Tr. 68.)

Plaintiff testified that her life was totally different because of her symptoms. (Tr. 69.) She explained that she cannot do what she wants to do or go where she wants to go. (Tr. 69.) For example, she has to give a lot of thought if invited to a party or a wedding because the activity will cause exhaustion, pain and the need to rest. (Tr. 69.) She testified that that her anxiety and fatigue

made it difficult for her to focus on any one thing for a very long time. (Tr. 73.) Plaintiff, however, testified that she was able to do light housekeeping, local driving, and go to the grocery store. (Tr. 73). She testified that she had stopped walking and exercising since becoming sick. (Tr. 73 74.) Plaintiff testified that she did not believe she could work full-time because it made her symptoms worse and she was trying to keep her chronic and progressive disease under control. (Tr. 74.).

b) Impartial Vocational Expert's Testimony

During the April 17, 2017 hearing, the ALJ asked an impartial vocational expert to consider a hypothetical individual of Plaintiff's age, education, and work experience, who was able to perform light work except that she was limited to never crawling or climbing ropes, ladders, or scaffolds; never being exposed to unprotected heights or hazardous machinery; occasionally climbing stairs and ramps, stooping, or crouching; frequently fingering; only occasional exposure to extremes in environmental conditions or concentrated pulmonary irritants; occasional reaching overhead and frequent reaching in all other directions; and only simple and repetitive tasks (Tr. 78-79). The vocational expert testified that such an individual could perform unskilled, light duty work as an inspector and hand packager, photocopying machine operator, or sealing and canceling machine operator, which are jobs that exist in significant numbers in the national economy. (Tr. 79.)

## II. STANDARD OF REVIEW

On review, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions on factual

questions are conclusive if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate as adequate to support a conclusion." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 503 (3d Cir. 2009) (citations omitted).

While a district court must examine the record in its entirety to determine whether the Commissioner's findings are supported by substantial evidence, the standard of review is deferential. *See id.* at 506 (stating that "[i]n determining whether there is substantial evidence to support an administrative law judge's decision," the Court "owe[s] deference to" the ALJ's "evaluation of the evidence, assessment of the credibility of witnesses, and reconciliation of conflicting expert opinions"). The district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder," *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993), or reverse the Commissioner's decision even if there is evidence in the record that would justify a different conclusion. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986). Furthermore, the district court may not "conduct its own independent analysis" of the record. *Kitchen v. Astrue,* 2012 WL 375250, at *3 (M.D. Pa. 2012) ("[T]he Third Circuit Court of Appeals [has] stated that the District Court should not conduct its own independent analysis when the ALJ fails to mention certain evidence and fails to consider all relevant and probative evidence.").

## III. <u>DISCUSSION</u>

The Social Security Act gives the Commissioner authority to pay social security benefits to disabled persons. *See* 42 U.S.C. § 423. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner applies a five-step test to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520. The first two steps require the claimant to demonstrate that she is not currently engaging in substantial gainful activity, and that she is suffering from a severe impairment. *Id*. A failure of proof at step one or step two renders the claimant ineligible for benefits. *See Dismuke v. Comm'r of Soc. Sec.*, 309 F. App'x 613, 615 (3d Cir. 2009) (citing *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999)). If, however, the claimant progresses to step three, then the question becomes "whether the impairment is equivalent to one of a number of Listed Impairments [as articulated in 20 C.F.R. Pt. 404, Subpart P, Appendix 1] that the Commissioner acknowledges are so severe as to preclude substantial gainful activity." *Id*. at 616 (quoting *Knepp v. Apfel*, 204 F.3d 78, 84 (3d Cir. 2000). If the claimant's specific impairment is not one of the Listed Impairments, the ALJ must then consider whether the claimant's impairment or combination of impairments is "medically equivalent" to one of the Listed Impairments. *See* 20 C.F.R. § 404.1526(a).

An impairment or combination of impairments is "medically equivalent" to one of the Listed Impairments if it is "at least equal in severity and duration to the criteria of any [L]isted [I]mpairment." *Id*. In other words, the claimant's impairment "must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely,

does not qualify." *Dismuke*, 309 F. App'x at 616 (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992) (emphasis in original). A claimant who satisfies step three "is conclusively presumed to be disabled." *Id*. (quoting *Knepp*, 204 F.3d at 84). A claimant who fails at step three must continue to steps four and five.

At step four, the question is "whether the claimant retains the residual functional capacity to perform her past relevant work." *Dismuke*, 309 F. App'x at 616 (quoting *Plummer*, 186 F.3d at 428). Residual functional capacity is defined as "what a [claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a). It is the claimant's burden to establish an inability to return to her past relevant work. *See Dismuke*, 309 F. App'x at 616. A failure of proof at step four dooms the claimant's case. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If, however, the claimant satisfies this burden, then the burden of production shifts to the Commissioner to show, at step five, that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity." *Dismuke*, 309 F. App'x at 616 (quoting *Plummer*, 186 F.3d at 428). This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the cumulative effect of all of the claimant's impairments renders her capable of working. *See* 20 C.F.R. § 404.1520(g).

In this appeal, Plaintiff argues that the decision of the ALJ (as affirmed by the Appeals Council) is based on an incorrect application of the law and is not supported by substantial evidence. She specifically challenges the ALJ's determinations at steps three and five. At step three, the ALJ determined that Plaintiff's impairments, either singly or in combination, did not meet or medically equal any of the presumptively disabling listed impairments. (Tr. 28-34.) At step five, after considering Plaintiff's age, education, work experience, residual functional

capacity, and the vocational expert's testimony, the ALJ determined that Plaintiff could make a vocational adjustment to light, unskilled jobs existing in significant numbers in the national economy, such as an inspector/hand packager, photocopy machine operator, and sealing/canceling machine operator. (Tr. 40-41.) Plaintiff raises several arguments to challenge these conclusions, which, for the following reasons, I find unpersuasive.

Plaintiff first contends that the ALJ erred in arriving at his determination at step three, because the ALJ's decision failed to properly consider whether the combined effect of Plaintiff's claimed medical impairments are medically equivalent to a Listed Impairment. More specifically, Plaintiff "maintains that if the ALJ combined all of Plaintiffs severe impairments against one of the Listed Impairments such as listings 14.09 (Inflammatory arthritis) and 14.02 (Systemic lupus erythematosus ), the combination of all of her impairments could result in a determination of those particular listings are equaled." (Pl. Br. at 12.) I disagree. On appeal, Plaintiff does not refer to any evidence or findings from the administrative record to support her claim that she met listings 14.09 and 14.02. It was her burden to offer such evidence. *See* 20 C.F.R. § 404.1526(b)(3) (stating, in relevant part, that "[i]f you have a combination of impairments, no one of which meets a listing . . . we will compare *your findings* with those for closely analogous listed impairments") (emphasis added); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 n. 2 (3d Cir. 2000) ("[T]he burden is on the claimant to present medical findings that show his or her impairment matches a listing or is equal in severity to a listed impairment") (citing *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir.1992)). Thus, Plaintiff's contention lacks merit without providing any supporting evidence (medical or otherwise) that she met listings 14.09 or 14.02.

Next, Plaintiff asserts that the ALJ erred at step five in arriving at his determination regarding the residual functional capacity of Plaintiff, because the ALJ's decision improperly

15

weighed the opinions of multiple physicians in the record. More specifically, Plaintiff "avers [that] the ALJ improperly rejected the medical opinions of her treating physicians." (Pl. Br. at 13.) Again, I disagree. In assessing a claimant's residual functional capacity, an ALJ must "base[]" its determination "on all of the relevant medical and other evidence," including the medical records, medical source opinions, and a claimant's allegations of her own limitations. 20 C.F.R. § 404.1545(a)(3). However, the ALJ is not required to accept all medical opinion evidence that is offered by the claimant. *See, e.g., Loubriel v. Colvin*, 2016 WL 676366, at *8 (D.N.J. Feb. 18, 2016) (finding no error where the ALJ rejected "at least some portion of every opinion" because the ALJ had a reasonable basis to do so based "on the actual medical tests and treatment records"). On the contrary, the Third Circuit has held "the ALJ is entitled to weigh all evidence in making its finding[s]," including "weigh[ing] the medical evidence and draw[ing] [his] own inferences." *Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011) (internal quotation marks omitted)); *Sponheimer v. Comm'r of Soc. Sec.*, 734 F. App'x 805, 808 (3d Cir. 2018) ("[T]he ALJ could properly discount the opinions of physicians whose opinions were inconsistent with . . . other substantial evidence in [the] case record.") (internal quotation marks omitted).

Here, in a detailed, 30-page decision, the ALJ weighed the opinions from multiple physicians and pointed to specific reasons to support the weight that he afforded to each opinion. Plaintiff submitted five one-page letters from her physicians and a nurse stating that she was disabled or that her impairments would affect her ability to work. The ALJ specifically discussed each of those letters in his decision. (*See* Tr. 38 (May 2014 letter from Dr. Bhana); Tr. 39 (May 2014 letter from Dr. Erb); Tr. 23 (May 2015 letter from Dr. Mathur); Tr. 39 (June 2015 letter from Dr. Grewal); Tr. 23 (May 2015 letter from Eileen Speranza, R.N.).) The ALJ noted that none of the letters assessed any specific functional limitations, and he further explained that he afforded

little weight to these letters because they were inconsistent with examination findings throughout the record and with some of the physician's own treatment records (Tr. 23-40). This is not a case where the ALJ failed to properly weigh the evidence; rather, the ALJ's decision shows that he appropriately weighed the medical opinion evidence and pointed to substantial evidence to support his findings.[2]

Finally, Plaintiff contends that the ALJ erred at step five by improperly relying on the testimony of the vocational expert that there were jobs in the national economy that Plaintiff could perform. More specifically, Plaintiff argues that the ALJ's hypothetical questioning of the vocational expert failed to consider her manipulative limitations or the that she would miss work due to the IV infusions that she received at her home every three weeks for about five to six hours. (Pl. Br. at 21-22.) I find that this contention lacks merit. Plaintiff does not point to any functional or work-related limitation that she believes the ALJ should have considered in the hypothetical posed to the vocational expert. Moreover, Plaintiff's allegation that she would miss work due to IV infusions is purely speculative. *Simpson v. Comm'r of S.S.A.*, 2011 WL 1261499, at *2 (D.S.C. Mar. 31, 2011) (refusing to remand based on "speculative" claim that plaintiff may miss work due to appointments, because plaintiff "still ha[d] the ability and aptitude necessary to work" and "speculation that she will miss work frequently for medical appointments is insufficient to demonstrate a limitation on her physical or mental ability to perform basic work activities"); *Hickey v. Berryhill*, 2017 WL 4023095, at *4 (D. Md. Sept. 12, 2017) (refusing to remand based on "scheduled appointments, not . . . emergencies, [] which could hopefully be arranged to

---

[2] In contrast, the ALJ afforded partial weight to the opinions of the two state agency physicians, Drs. Abdelmessieh and Pirone, noting that they were generally consistent with the record evidence, which revealed that Plaintiff required limitations in reaching and lifting due to her impairments. (Tr. 34, 38, citing, e.g., Tr. 378, 380.)

accommodate Plaintiff's work schedule").[3] There is no indication here that Plaintiff's IV infusions could not be scheduled to accommodate her work schedule. Thus, the ALJ did not err in relying on the vocational expert's response to the hypothetical posed to support his finding that there were a significant number of jobs in the national economy that Plaintiff could perform.

## IV. CONCLUSION

For the reasons set forth above, the Court concludes that the ALJ correctly applied the law and that there is substantial evidence in the record to support the determination by the Commissioner that Plaintiff was not disabled from May 22, 2013 through August 1, 2017. Therefore, the final decision of the Commissioner is **AFFIRMED**. An appropriate Order accompanies this Opinion.

DATED: August 19, 2020

/s/ Freda L. Wolfson  
Hon. Freda L. Wolfson  
U.S. Chief District Judge

---

[3] I note that, in a final sentence to her brief, Plaintiff contends that "the ALJ's finding that Plaintiff could perform frequent fingering is not consistent with the records as a whole thereby warranting a remand for further proceedings." (Pl. Br. at 20.) I decline to consider such a threadbare contention, which Plaintiff does not support with any argument or evidence from the record.